OPINION OF THE COURT
Richard Lee Price, J.
The defendant is charged with three counts of unlawfully dealing with fireworks in violation of Penal Law § 270.00 (2) (a) (i), (ii) and (b) (i). Defendant moved, among other things, for suppression of approximately 8,000 pounds of fireworks on the grounds that they were seized without probable cause, and statements allegedly made to the arresting officers as the fruit of an unlawful arrest. By decision rendered from the bench on October 29, 2007, Justice Steven Barrett ordered that a combined Mapp /Huntley/Dunaway hearing be conducted.
On May 28, 2009, this court was scheduled to conduct a combined Mapp/Huntley/Dunaway hearing. Prior to commencing, however, defendant moved by oral application to preclude the District Attorney from introducing any evidence concerning, or eliciting any testimony regarding, the existence and seizure of the alleged fireworks. The basis of this application was the District Attorney’s failure to comply with defendant’s demand, which was made through counsel by letter dated September 14, 2007, for an opportunity to “scientifically inspect” the fireworks seized from the defendant. The People’s failure to comply was predicated on the alleged fireworks having been intentionally destroyed in their entirety after defendant’s arrest and before his arraignment. Such destruction, defendant argues, deprived, him of the ability to prepare a meaningful defense resulting in irreparable harm.
The People, while conceding that the fireworks were intentionally destroyed, opposed defendant’s application for preclusion arguing that if any sanction should be imposed, an adverse inference instruction is appropriate and sufficient. After hearing the contentions of the parties, this court adjourned the matter until May 29, 2009, to provide them with an opportunity to supply this court with any relevant authority in support of their positions.
On May 29, 2009, this court heard additional arguments from the parties on this issue. Upon concluding, it became clear to *615 this court that the issue of preclusion hinges on, among other things, the circumstances surrounding the intentional destruction of the fireworks and whether such destruction deprived the defendant of his constitutional right to due process. Accordingly, by decision dated June 11, 2009, this court ordered that a hearing on this issue be conducted believing it to be both necessary and justified.
Findings of Fact[1]
On June 11, 2009, this court commenced a hearing, which concluded on June 12, 2009. After hearing oral argument from both the defendant and the People, and reviewing their respective written submissions, defendant’s motion is granted.
At the hearing, the People called three witnesses: Detective Joshua Vanderpool, Detective Raymond Butkiewicz and Lieutenant Mark Torre, all of whom are members of the New York City Police Department (NYPD). Defendant called no witnesses. Detective Joshua Vanderpool, the People’s first witness, stated that he has been a New York City police officer for nine years, the last four of which with the Bronx Vice Enforcement Squad (hearing record at 6). He further stated that he has been involved in approximately 10 cases concerning fireworks, and has gained a “working knowledge of or in recognizing fireworks . . . and the packaging that they come in” (hearing record at 8-9).
The People’s second witness, Detective Raymond Butkiewicz, stated that he has been a New York City police officer for 23 years, the past eight of which with the Bomb Squad and the last three serving as the range safety officer at the Bomb Squad’s facility in Rodman’s Neck (hearing record at 101). Detective Butkiewicz further stated that he is trained in the recognition and destruction of fireworks, and has participated in approximately 20 such destructions (hearing record at 111).
Their third and final witness was Lieutenant Mark Torre, a 24-year veteran of the New York City Police Department who is the current commanding officer of the Bomb Squad. Lieutenant Torre is a certified bomb technician charged with responding to and investigating any reports of suspected explosive devices as well as overseeing their safe disposal (hearing record at 211-212). Lieutenant Torre stated that he has been a member of the Bomb Squad since 1993, serving as its commanding officer since *616 2002 (hearing record at 210-211). During his career, Lieutenant Torre has observed approximately 50 fireworks destruction operations (hearing record at 221) and, between 1991 and 1997, was affiliated with the Grucci Company as a professional pyrotechnician where he worked with a number of different types of fireworks (hearing record at 216).
This court notes the combined 56 years of law enforcement experience, nearly half of which specifically relate to the recognition and destruction of fireworks. As such, this court finds the officers’ testimony credible to the extent indicated herein.
On June 14, 2007, Detective Vanderpool traveled to a UPS freight facility located in Bethlehem, Pennsylvania where, based upon information received from his captain, a large quantity of fireworks was expected to be picked up and transported to the Arthur Avenue area of the Bronx (hearing record at 11, 13-14). Detective Vanderpool stationed himself outside the UPS facility and approximately 45 minutes later observed a truck matching the description that he was given drive into a loading bay. He then observed the defendant exit the passenger side (hearing record at 17-18) and supervise the loading of eight pallets containing shrink-wrapped cardboard boxes into the back of the truck (hearing record at 19). Detective Vanderpool testified that as the boxes were being loaded onto the truck, he “saw the distinctive orange diamond shaped pattern stating 1.4 G,” a label that he knew to be class C fireworks (hearing record at 21).[2]
*617 After loading all eight pallets, defendant entered the passenger side of the truck, which left the UPS facility en route to New York. Several unmarked NYPD vehicles followed the truck (hearing record at 23-24), until it eventually stopped at the corner of 181st Street and Belmont Avenue in Bronx County at approximately 1:00 p.m. (hearing record at 11). Detective Vanderpool, wearing a police raid jacket, approached the truck with his police shield displayed (hearing record at 27) and identified himself as a police officer. Upon asking the defendant what he had in the truck, the defendant responded, “I have fireworks” (hearing record at 28). Defendant then complied with Detective Vanderpool’s request to open the truck, at which time the detective observed “eight large pallets bearing cardboard boxes . . . [that] had an orange diamond label on them saying 1.4 G. They also had numerous brands of fireworks which are mass produced, such as AFW, Glorious, and New Century” (hearing record at 29). He further stated that the boxes were labeled “Made in China,” and that based on his knowledge, many fireworks companies receive their products wholesale from China (hearing record at 30). Detective Vanderpool then observed the fireworks’ shipping manifest on the dashboard, which contained the defendant’s “name, home address . . . and the wholesale location in Lumbert, Ohio, Lumbert Wholesale” (hearing record at 34).
Defendant was taken to the PSA 7 Precinct where Detective Vanderpool advised the defendant of his Miranda rights. The defendant indicated that he fully understood each right as it was read to him from a pre-printed form by placing his initials at the end of each line (hearing record at 56-57).[3] Additionally, the defendant neither requested nor was denied food, drink or bathroom privileges (hearing record at 58-59). Detective Vanderpool testified that after the defendant agreed to waive his right to remain silent (hearing record at 57), he “stated to me that he had purchased [the] fireworks for a block party for the Fourth of July. That he and several of his friends had purchased them for six to ten thousand dollars” (hearing record at 60).
*618 At approximately 6:15 p.m". on June 14, 2007, the truck, with the eight pallets of fireworks still inside, was transported to the Bomb Squad’s facility located in Rodman’s Neck, Bronx County (hearing record at 42, 123) for the purpose of being destroyed. Bomb Squad Detective Butkiewicz estimated that the eight pallets contained approximately 480 boxes of fireworks weighing roughly 8,000 pounds (hearing record at 126, 173). Detective Butkiewicz and Lieutenant Torre described observing the same orange diamond label and 1.4 G marking on the boxes that Detective Vanderpool stated he had observed. According to Lieutenant Torre, this was the typical shipping box for 1.4 G fireworks because it displayed the manufacturer’s mark, location of origin, a description of the item, the quantity, and “a placard which is a square placed on edge to look like a diamond orange label with the labeling 1.4 G and a small logo showing an explosive going off to indicate that this is an explosive hazard 1.4 G” (hearing record at 126, 228-229). Bomb Squad technicians then opened several boxes and detectives observed “large quantities of roman candles, bottle rockets, fire crackers, M80’s, thunder balls, and an assortment of other fireworks” (hearing record at 45, 236). They were then inspected to ensure that no obvious hazardous conditions existed from the fireworks such as “a hanging wire, a light that is not enclosed, or a hanging bulb” (hearing record at 238-239).
After inspecting the seized fireworks, Detective Butkiewicz “vouchered” the boxes by preparing and signing an NYPD form documenting the seized items and stamping the voucher, “not required as evidence” (hearing record at 173). Both Detective Butkiewicz and Lieutenant Torre explained that their practice was to not remove them from the truck until they were to be destroyed because it was safer to leave them in one place rather than move them and risk accidental ignition by handling them (hearing record at 142-143, 240). Moreover, the “magazine” at Rodman’s Neck used to store explosives was neither large enough to accommodate the seized quantity (hearing record at 145) nor capable of storing any quantity for an extended period of time (hearing record at 146-147). Detective Butkiewicz stated that standard NYPD procedure requires the Bomb Squad to immediately destroy all seized fireworks delivered to the Rod-man’s Neck range because fireworks “are susceptible to heat, shock, and friction . . . [and] are easily ignitable,” they are too dangerous to remain on the street or in the precinct for any period of time (hearing record at 123, 124). Lieutenant Torre *619 stated that “every piece of fireworks that comes through the threshold of our gate is destroyed” (hearing record at 234), adding that in his 16 years of experience in the Bomb Squad, he could not recall a single incident where fireworks were brought to Rodman’s Neck and not destroyed there (hearing record at 234).
Notably, Bomb Squad detectives performed no tests or examinations to verify that the boxes in fact contained fireworks and preserved nothing for future testing or inspection since they “destroy all the fireworks as soon as they come in[;] we do not collect any for evidence” (hearing record at 146-147). Moreover, no video or photographic evidence was taken of either the fireworks or their destruction because according to Lieutenant Torre, “we don’t need any record of that” (hearing record at 168, 253-254). When asked whether any of the seized fireworks were saved, Lieutenant Torre testified as follows:
“ada sotirhos: Were any saved for evidence?
“lt. torre: No.
“ada sotirhos: How come?
“lt. torre: We do not store any fireworks for evidence. It’s not required and it’s not something that — . . .
“ada sotirhos: When you mean it’s not required, what do you mean?
“lt. torre: . . . We do not submit any fireworks for laboratory testing. We identify fireworks based on our training and experience as bomb technicians coupled with the results we see when we destroy them.” (Hearing record at 246-247.)
Regarding the decision to proceed with destroying the seized fireworks without documenting their existence or destruction, Lieutenant Torre testified as follows:
“ada sotirhos: What happened to the fireworks that were received from Bronx Vice on June 14, 2007?
“lt. torre: That truck was brought into our facility for safekeeping purposes, once we determined that there were no apparent obvious hazards.
“ada sotirhos: And . . . what happened to it eventually?
“lt. torre: It was destroyed the next day.
“ada sotirhos: The next day. Whose decision was it to destroy this particular shipment of fireworks *620 you received from Bronx Vice on the 14th of June? “lt. torre: It’s my decision upon conferral with the range safety officer as to existing conditions, would they allow us to do the destruction?” (Hearing record at 43, 242-243.)
At approximately 12:35 p.m. on June 15, 2007, Bomb Squad detectives destroyed the seized fireworks in their entirety[4] based on their belief that what they seized were in fact 1.4 G consumer fireworks. Such belief was based largely on their observations of the boxes, their labeling and packaging (hearing record at 183, 254-255), and the “burn,”[5] which resulted in “a huge fire, lot of smoke . . . fireworks launching out of the burn . . . rockets and mortars, [and] helicopters.” (Hearing record at 163.) Observing this, Detective Butkiewicz, who this court qualified “as an expert in the recognition and destruction of fireworks,” testified that in his expert opinion such characteristics are “consistent with the combustion of 1.4 G fireworks” (hearing record at 163-164). Accordingly, Detective Butkiewicz concluded that the more than 480 boxes seized from the defendant did in fact contain “consumer fireworks, 1.4 G” (hearing record at 169, 173).
Detective Butkiewicz explained that the fireworks were destroyed on June 15 instead of immediately upon receiving them on June 14 because a “burn” had been conducted on June 13. Since the pit can stay “hot” for hours after a burn, the *621 Bomb Squad waits a minimum of 24 hours before conducting another burn (hearing record at 191). He acknowledged that although “the hazard existed until the fireworks are disposed of’ (hearing record at 187), manpower concerns or “environmental issues” also restrict the Bomb Squad’s ability to destroy fireworks “at the earliest possible convenience” upon receiving them (hearing record at 148, 178, 187). For example, Detective Butkiewicz stated that “[w]e only destroy them during daylight hours,” “don’t start operations there [at Rodman’s Neck] until after 9:00 o’clock” and “go home at 3:00” (hearing record at 185-186). In addition, numerous notifications must first be made, such as the police firing range located at Rodman’s Neck, the Patrol Borough Bronx, the 45th Precinct desk, the EMS dispatcher and the Fire Department (hearing record at 152).
In addition to manpower concerns, Detective Butkiewicz testified that environmental issues also affect when a burn may be conducted. On direct examination, when asked what determines when fireworks are destroyed, Detective Butkiewicz stated,
“[I]t has to be a clear, preferably not windy or cloudy or low ceiling day ... so obviously you don’t want, if it’s raining recently, wet ground. Or if it’s about to rain, low cloud cover, keeps the smoke and heat from rising, and you want the smoke to rise and lift away from the surrounding community. And you don’t want any lightning or you don’t want any, particularly in the winter, you get particularly dry weather, you get more static in the winter. You don’t want wind because wind can produce friction and static also.” (Hearing record at 148-149.)[6]
On cross-examination, however, Detective Butkiewicz conceded that if the weather had been rainy or drizzly, the fireworks would have to be stored until the weather cleared, regardless of how long it took (hearing record at 176).
Finally, Detective Butkiewicz testified that it is not the standard practice of the Bomb Squad to notify the District Attorney’s Office regarding the impending destruction of fireworks seized from a defendant and that he personally had never done so (hearing record at 174, 188). Detective Vanderpool testified that he had no familiarity with Penal Law § 405.05, which requires law enforcement officers who seize fireworks from a defendant to “deliver the same to the magistrate before whom *622 the person arrested is required to be taken . . . [who must] determine whether the fireworks had been possessed by the defendant in violation of the provisions of section 270.00” (hearing record at 71). Lieutenant Torre, who has been a member of the Bomb Squad for 16 years and the commanding officer for seven, testified that despite being “generally familiar with the New York State and Federal Laws regarding disposal of explosives,” he had no knowledge of Penal Law § 405.05 (hearing record at 210-211, 217). Regarding this, Lieutenant Torre testified on cross-examination as follows:
“mr carrozza [defense counsel]: Now, you told us about all your training and how over the years on the job you learned from people with expertise, correct?
“lt. torre: Yes, sir.
“mr carrozza: And you never heard of 405.05 of the Penal Law, did you?
“lt. torre: No, sir.
“mr carrozza: That said, you must, M-U-S-T, bring, technically, the alléged fireworks before a magistrate; you never heard about that?
“lt. torre: No, sir.
“mr carrozza: All those years of on the job training no one ever told you about that?
“lt. torre: We’re not an enforcement command, sir, so we wouldn’t be . . . bringing anything to any magistrate.
“mr carrozza: I understand, but you have dealt with the District Attorney’s Office before, I’m sure?
“lt. torre: Absolutely.
“mr carrozza: And in fireworks cases, correct?
“lt. torre: From time to time. Typically I get questions.
“mr carrozza: Still never heard about 405?
“lt. torre: No, sir” (hearing record at 256-257).
“mr carrozza: And in this case you’ve already told us you didn’t comply with 405.05 of the Penal Law?
“lt. torre: We did not.
“mr carrozza: And in fact in your experience you never did?
“lt. torre: That is correct.
“mr carrozza: At least in your experience as head
*623 of the Bomb Squad . . . it’s been police procedure not to comply with 405?
“lt. torre: Our procedure ... is to perform our operations to the greatest degree of safety of our personnel. If that precludes the notification in certain instances, as it did in this one . . . that is what happened.” (Hearing record at 263-264.)
Conclusions of Law
It is elementary that the prosecution is obligated to disclose to the defense any evidence which is both discoverable and within its control (People v Haupt, 128 AD2d 172, 175 [2d Dept 1987], citing United States v Bryant, 439 F2d 642, 647 [1971]; see also People v Christopher, 167 Misc 2d 468 [Crim Ct, Bronx County 1995, Sussman, J.]). Moreover, “[i]t is the prosecution’s responsibility to exercise care to preserve evidence and if the defendant is prejudiced by the loss of . . . evidence, the court must impose an appropriate sanction” (167 Misc 2d at 473). Defendant claims that because of the fireworks’ destruction, he has been deprived of the right to a fair trial and has been irreparably harmed. Consequently, defendant argues he is prevented from developing a meaningful defense that the alleged fireworks were not, in fact, fireworks. He further argues that the only evidence available to cross-examine or refute the charged offenses is testimony from the arresting officers and photographs depicting merely the outer labeling of some of the seized boxes. Preclusion, accordingly to the defendant, is therefore necessary and warranted.
The People concede that the NYPD intentionally destroyed the entire load of alleged fireworks seized from the defendant without notifying him or the District Attorney, but argue that an adverse inference instruction is both appropriate and sufficient. They reason that the defendant retains the ability to cross-examine the arresting officers, and detectives assigned to the Bomb Squad who could testify as expert witnesses that the seized fireworks were, in fact, fireworks. As such, the People assert there is substantial proof available to the defendant at trial to present a meaningful defense. They also assert that precluding testimony and the introduction of evidence concerning the seized fireworks renders it impossible for them to establish the charged offenses and would be tantamount to outright dismissal.
*624 The People further concede that members of the NYPD Bomb Squad destroyed the alleged fireworks in violation of Penal Law § 405.05, which provides:[7]
“Fireworks possessed unlawfully may be seized by any peace officer, acting pursuant to his special duties, or police officer, who must deliver the same to the magistrate before whom the person arrested is required to be taken. The magistrate must, upon the examination of the defendant . . . determine whether the fireworks had been possessed by the defendant in violation of the provisions of section 270.00; and if he finds that the fireworks had been so possessed by the defendant, he must cause such fireworks to be destroyed, in a way safe for the particular type of such fireworks, or to be delivered to the district attorney of the county in which the defendant is liable to indictment or trial, as the interests of justice and public safety may, in his opinion, require.” (Emphasis supplied.)
It appears that, in drafting this statute, the Legislature understood the inherent danger involved when dealing with fireworks, and the imperative to expeditiously destroy such explosives in a safe manner (see Christopher at 471 [“The People maintain that their actions are excusable given the danger posed *625 by the fireworks. Such an argument ignores the fact that due to the inherent dangerous nature of fireworks, the Legislature imposed restrictions for the manner in which they should be impounded and for their eventual disposal”]). Significantly, “[i]t is for a Magistrate, not the prosecution, to determine whether the fireworks pose too great a risk to the safety of others so as to warrant their destruction prior to the defendant’s trial” (id.).
Thus, the Legislature apparently understood that in certain circumstances, the District Attorney may retain fireworks as evidence. Upon a magistrate’s determination that the evidence is indeed illegal fireworks, the magistrate may opt to deliver them “to the district attorney of the county in which the defendant is liable to indictment or trial.” (Penal Law § 405.05.) The statute continues that “[u]pon the conviction of the defendant, the district attorney must cause to be destroyed, in a way safe for the particular type of such fireworks, the fireworks in respect whereof the defendant stands convicted, and which remain in the possession or under the control of the district attorney.” (Id.) The language of the statute acknowledges the ability of the Office of the District Attorney to retain some of this evidence. And despite the legitimate safety concerns involved when dealing with fireworks, the Legislature surely did not intend for the unilateral, complete and unnoticed destruction of such evidence prior to trial.
Clearly then, Penal Law § 405.05 is concerned with protecting the constitutional rights of the criminal defendant (Christopher at 471). However, while imposition of a sanction is warranted for abrogating Penal Law § 405.05, none is specified. Thus, the court is relegated to exercising its discretion in making such a determination (id.). In so doing, a court may consider “the degree of prosecutorial fault . . . but the overriding concern must be to eliminate any prejudice to the defendant while protecting the interests of society” (People v Kelly, 62 NY2d 516, 520 [1984]).
When the police intentionally destroy evidence, preclusion has been deemed an appropriate response to rectify prejudice to the defendant. In People v Johnson (114 AD2d 515 [2d Dept 1985]), the court held that preclusion was the appropriate sanction for the intentional loss of evidence by police in a robbery prosecution. In that case, the police violated a statute governing the return of confiscated property and specifying the notice requirements to defendants prior to that return. As a result of the officers’ failure to comply with the statute, the Court *626 determined that preclusion of any mention of the returned property would appropriately eliminate prejudice to the defendant (cf. Christopher at 473 [where, despite police officers’ failure to follow Penal Law § 405.05, the court found that preclusion was not warranted because the defendant failed to specify how he had been prejudiced by the loss of such evidence]). The court noted that although precluding the evidence would make it more difficult for the prosecution to prove its case, it would perhaps induce the prosecution to comply with the governing statute in the future.
Similarly, in People v Wagstaff (107 AD2d 877 [3d Dept 1985]), the police intentionally destroyed 16.5 pounds of vegetative matter, alleged to be marijuana, that formed the basis of a marijuana possession charge. As in this case, the defendant in Wagstaff requested an opportunity to examine the evidence, but the request could not be granted because it had been destroyed prior to indictment. While the destruction of the vegetative matter was carried out intentionally, the court determined there was no bad faith involved. Nonetheless, the Court precluded the evidence and dismissed the charges, finding that the harm suffered by the defendant could only be appropriately remedied by preclusion, even when it amounted to a dismissal (Wagstaff at 878).
The defendant in this case, like in Wagstaff, was deprived of the ability to independently analyze the evidence that formed the basis of the accusations against him. The Court in Wagstaff found that the destruction of the evidence prevented the possibility of proving its chemical makeup or how much of the matter was confiscated (Wagstaff at 879). The defendant here is similarly deprived of the ability to test the fireworks evidence or properly cross-examine the People’s witnesses, as he cannot independently examine the evidence to determine its chemical composition or exactly what was contained in the confiscated boxes. As this deprivation is the direct result of the People’s intentional actions, the correct sanction should be preclusion, as it was in Wagstaff (see also People v Torres, 190 AD2d 52 [3d Dept 1993] [where the Court determined that preclusion was the only appropriate sanction following the sheriffs intentional, though not malicious, destruction of evidence which could have corroborated a viable defense theory and severely undercut the People’s case]; cf. Christopher at 473 [where adverse inference was determined to-be a sufficient sanction because the defendant did not specify how he was prejudiced]).
*627 Accordingly, the officers’ intentional destruction of all the alleged fireworks seized from the defendant in violation of Penal Law § 405.05 resulted in a constitutional deprivation of the defendant’s right to a fair trial thus warranting preclusion. That none of the officers were aware of Penal Law § 405.05 is of no moment. Of course, ignorance of the law is inexcusable but such ignorance on the part of law enforcement agents is indefensible. Nevertheless, considering the nearly three decades of combined law enforcement experience and general familiarity with the New York State and federal laws regarding disposal of explosives, this court is troubled by the NYPD Bomb Squad’s standard practice to unilaterally destroy seized fireworks without first notifying and consulting the District Attorney’s Office.
Of particular concern is that while Bomb Squad commanding officer Lieutenant Torre stated their “procedure ... is to perform our operations to the greatest degree of safety of our personnel. If that precludes notification in certain instances, as it did in this one . . . that is what happened,” Detective Butkiewicz admitted that the standard practice is to not notify the District Attorney’s Office. This court is further distressed by Lieutenant Torre’s testimony justifying the Bomb Squad’s policy of immediate, unilateral and complete destruction: “we don’t need any record of that,” “We do not store any fireworks for evidence. It’s not required” and “We’re not an enforcement command, sir, so we wouldn’t be . . . bringing anything to any magistrate.”
Certainly, this court appreciates the obvious hazards presented by prolonged retaining and storing of explosive materials such as fireworks and recognizes that their expeditious destruction may very well be necessary because they “are susceptible to heat, shock, and friction . . . [and] are easily ignitable” to remain on the street, in the precinct or in a storage facility for any significant or extended period of time. The need for absolute summary destruction, however, is simply not credible. Detective Butkiewicz stated that the alleged fireworks were destroyed at approximately 12:35 p.m. on June 15, 2007, instead of immediately upon receiving them on June 14, 2007, because a “burn” had been conducted the day before. Not coincidentally, the defendant was also arraigned on June 15, 2007.[8] After establishing that a “burn” could only take place in daylight, *628 defense counsel, Mr. Carrozza, asked on cross-examination why, if immediacy was of such importance, it would not have taken place at sunrise. Detective Butkiewicz replied that the tour of duty did not begin until 9:00 a.m. and then numerous notifications had to be made, such as the police firing range located at Rodman’s Neck, the Patrol Borough Bronx, the 45th Precinct desk, the EMS dispatcher and the Fire Department. Conversely, after establishing that no significant harm would have resulted had they waited until 6:00 p.m. to conduct the burn, when asked why they did not wait, Detective Butkiewicz responded that their tour of duty ends at 3:00 p.m.
Testimony was also elicited that in addition to the safety risks presented by the fireworks and the need to avoid inclement weather such as rain, lightning, or wind, immediate destruction was necessary because of the lack of a storage facility at Rod-man’s Neck to accommodate a truckload of approximately 8,000 pounds. Yet, in East Coast Novelty Co. Inc. v City of New York (781 F Supp 999 [1992]), the NYPD managed to store 20 truckloads containing more than 9,000 cases of class C fireworks at Rodman’s Neck for at least a month. Interestingly, in that case, a hearing was held in New York City Criminal Court pursuant to Penal Law § 405.05 two days after defendant’s arrest for the explicit purpose of seeking a court order authorizing the destruction of the seized fireworks. Indeed, Detective Butkiewicz conceded on cross-examination, that had the weather been rainy or drizzly, the fireworks would have, in fact, been stored until the weather cleared, regardless of how long it took.
To be sure, this court is neither unsympathetic nor insensitive to the legitimate safety concerns associated with handling and destroying explosives such as fireworks. Nothing, however, presented by the People either satisfactorily explains or justifies the failure to notify the District Attorney or the defendant. Nor does it in any way excuse the officers’ failure to comply with Penal Law § 405.05, especially since the defendant appeared before the arraignment judge within hours of the destruction.
In urging this court to impose an adverse inference instruction, the People rely on People v Kelly (62 NY2d at 521), where the Court stated that “the drastic remedy of dismissal should *629 not be invoked where less severe measures can rectify the harm done by the loss of evidence.” With this, neither the defendant nor this court disagrees. Law enforcement authorities, however, are not to decide what should be preserved and should be destroyed (People v Saddy, 84 AD2d 175, 178 [2d Dept 1981]). A police policy to destroy fireworks, despite a legitimate public safety rationale, does not excuse the intentional destruction of evidence. Police officers, as members of the government involved in a criminal investigation of a defendant, are agents of the Office of the District Attorney (see Kelly at 520 [stating that the prosecutor is responsible to prevent the loss of “discoverable evidence gathered by the prosecution or its agent” (emphasis added)]).
The People also emphasize that the Bomb Squad officers did not act in “bad faith” to the extent that their decision to immediately destroy the entire load of alleged fireworks was not intended to prejudice the defendant. The intentions of such agents, however, are of little weight, as the People’s obligation to the defendant is not measured by moral culpability. “Even though the People may not have acted in bad faith, they should not escape responsibility for the deliberate destruction of the evidence” (People v Christopher at 473, citing Saddy at 179). If destruction of evidence results in a constitutional deprivation to the defendant, it is because of “the character of the evidence, not the character of the prosecutor [or its agent]” (Torres at 56 [emphasis added]; see also Kelly at 520).
This court is certainly reluctant to preclude the People’s evidence. Under all the circumstances presented to this court, however, this court has come to the inescapable conclusion that it is the only sanction commensurate with the intentional, inexcusable and complete destruction of the alleged fireworks. Combined, the officers’ abject failure to comply with Penal Law § 405.05, failure to notify or consult with the District Attorney, failure to preserve a sample, failure to perform any physical or chemical analysis, failure to photograph the contents of the boxes, failure to videotape the destruction proceeding, and failure to memorialize a complete record of the officers’ findings and observations before the defendant had an opportunity to inspect them, deprived the defendant of his right to a fair trial.
The People’s argument that preclusion is tantamount to an outright dismissal due to the lack of other evidence to establish the charged offenses merely strengthens this court’s analysis warranting preclusion. If, indeed, the testimony and evidence *630 concerning the seized fireworks is central to the prosecution’s case, it stands to reason that it is also central to the defendant’s ability to prepare a meaningful defense. Consequently, their immediate and unilateral destruction in contravention of Penal Law § 405.05 unjustifiably prejudices defendant. It is entirely conceivable then, that imposing the sanction of preclusion will resonate so as to ensure future compliance with Penal Law § 405.05.
For the reasons stated, defendant’s application to preclude the People from introducing at trial any evidence or eliciting any testimony concerning the seizure of alleged fireworks from the defendant is granted.

. All references are to the hearing record and are summaries, or quotes where indicated, of the testimony given during this proceeding.

. 1.4 G fireworks, known as consumer or common class fireworks, are packaged in brightly colored packaging that can be purchased in any state where it is legal to do so. Examples of 1.4 G fireworks are firecrackers, bottle rockets, Roman candles, smoke bombs, whistling chains, small aerial salutes and small aerial display shells. Conversely, 1.3 G, or commercial, fireworks are known as professional pyrotechnic display shells that are typically used in July 4th displays, and range in diameter from 3 to 16 inches and have a power lift charge, meaning that they are launched out of mortar tubes for the purpose of generating an aerial display. Examples of 1.3 G fireworks are mortars, fountains and display trays.
1.4 G and 1.3 G fireworks are scientifically different as well. 1.3 G fireworks have a high ratio of explosive composition to packaging material. 1.4 G fireworks contain approximately 50 to 130 milligrams of powder; 1.3 G fireworks may contain a couple of ounces to a few pounds of powder and may only be purchased by licensed professionals, not consumers off the street.
There is also a significant difference in the manner in which they are destroyed. 1.4 G fireworks are destroyed in an open burn environment because they do not contain as much explosive power. 1.3 G fireworks, however, must be destroyed in small quantities, a couple of cases at most, which are placed in *617 a closed bunker and violently exploded in a matter of seconds. (Hearing record at 116-121, 216-218, 224-225.)

. It should be noted that Detective Vanderpool stated the original form from which he read defendant his Miranda rights, and on which defendant placed his initials, is now missing. The Miranda form that the People introduced in evidence as People’s exhibit 10 was a copy from Detective Vanderpool’s memo book identical to that form from which he read to the defendant (hearing record at 52).

. It should be noted that approximately 85 other bags and boxes of separately seized fireworks were destroyed along with those seized from the defendant. Detective Butkiewicz explained that the reason for this was because “we had the climate conditions and the manpower and the Fire Department and the EMS company standing by, that way we can empty the magazine for future delivery of fireworks” (hearing record at 157).

. Detective Butkiewicz provided a detailed explanation of the process employed in destroying the fireworks. They were first brought to the Bomb Squad’s disposal area, which consists of four pits. The pits are on level ground, “but there are earth berms around them and the berm is about twenty feet, shaped like the letter ‘C’, with one access and egress point” (hearing record at 154). The fireworks were then unloaded and placed into the pit (hearing record at 156), at which point the detective “put an accelerant, about half a gallon to a gallon of diesel fuel on the boxes, on the fireworks and on the pallet” as well as two bags containing “low explosive smokeless powder” that were primed with two electric matches each (hearing record at 160). The electric matches were then connected to a “blasting line” that ran 300 feet to the safe area where the members of the Bomb Squad were stationed (hearing record at 160-161). Once the pit was prepared, an electrical charge was sent through the blasting line that sparked the electric matches and, in turn, ignited the powder bags. This resulted in an 8-to-10-foot fire that quickly ignited the fireworks causing a chain reaction where “the whole pile cooks off within three to five minutes” (hearing record at 162).

. Detective Butkiewicz testified that the weather conditions on June 14, 2007 were “[c]lear, 75 degrees Fahrenheit” (hearing record at 154).

. Penal Law § 405.05 was derived from section 1894 of the Penal Law of 1909, which controlled the possession, manufacture and use of “explosives and combustibles” and which was apparently intended to encompass a wide range of materials including gunpowder, dynamite, nitro-glycerine and fireworks. In 1940, the Warner-Milmoe Fireworks Bill added section 1894-a, which specifically controlled the sale, distribution and possession of fireworks. In 1948, section 1894-a was amended to include subdivision (10) (“Seizure and destruction of fireworks”), which provided that “[fjireworks possessed unlawfully . . . may be seized by any peace officer.”
It further provided that the arraigning magistrate must determine whether the defendant violated section 1894-a and either “cause such fireworks to be destroyed . . . or to be delivered to the district attorney of the county in which the defendant is liable to indictment or trial.” (Id.) Where the magistrate ordered the fireworks be held by the district attorney, “the district attorney must cause to be destroyed . . . the fireworks in respect whereof the defendant stands convicted, and which remain in the possession or under the control of the district attorney.” (Id.)
Penal Law § 405.05 adopts the language contained in subdivision (10) of section 1894-a, except for two minor distinctions: the re-numbering of the statute prohibiting the sale and possession of fireworks (now Penal Law § 270.00), and removal of the clause declaring fireworks a “public nuisance.” In 1980, Penal Law § 405.05 was amended to specifically include police officers as “any peace officer.” It must be noted, however, that section 1894 and its progeny has never provided the sanction to be imposed for its abrogation.

. This court takes judicial notice that the defendant was arraigned in Bronx Criminal Court on June 15, 2007, in Arraignment Part AB.-2. While the *628 precise time of his arraignment is not known, this court concludes that it would have occurred by no later than 5:00 P.M. as Part AR-2 is a misdemeanor and DAT (desk appearance ticket) part, which is only in session during regular court hours: Monday through Friday from 9:00 A.M. until 5:00 P.M.